Crenshaw, Dupree & Milam, Cecil C. Kuhne, Lubbock, for appellant.

Gillespie & McClendon, Jack McClendon, Lubbock, for appellee.

**PINKEY'S LIQUOR STORES OF ODESSA, INC., Appellant,**

v.

**Luid W. CARLEE, Appellee.**

**No. 353.**

Court of Civil Appeals of Texas.

Tyler.

June 27, 1968.

Rehearing Denied Sept. 19, 1968.

SELLERS, Justice.

The appellee, Luid W. Carlee, brought this suit against appellant, Pinkey's Liquor Stores of Odessa, Inc., to recover for personal injuries received by him when he collided with a glass door at appellant's liquor store.

The appellant's liquor store is an air-conditioned building with three sliding glass doors that work automatically. When a customer steps on a rubber mat leading to the door, it automatically opens and remains open until the customer steps off the rubber mat, when it automatically closes again. The door involved on this appeal is the one to the rear of the building.

Appellee, who had been living in Lubbock for about seven years, moved to Lubbock from Alabama where he was engaged as a miner, and his wife was back there on a visit when this accident happened on June 8, 1963. On this date, appellee got off work about five o'clock, went home, took a bath, and went down to the liquor store to get a sandwich and a 6-can pack of beer. He arrived at the liquor store about seven o'clock and after parking his car, went to the restroom which was located to the back of the building immediately across from the glass door of the liquor store some twenty feet distance from the door. When he entered the restroom it was raining a little, but while he was in the restroom, it came somewhat of a downpour. Appellee, on

the occasion when he went to the restroom, testified that all three doors to the appellant's building were open, and as he left the restroom to enter the liquor store, he could see the rear door was standing open. He testified that he had to wade about an inch of water before reaching the mat that went to the door. The Statement of Facts reveals his version of what happened then, as follows:

"Q  What you are saying, am I correct—state whether or not I am correct, when you stepped off of that thing, the first time you looked at the door it was standing open, is that correct?

"A  That's right.

"Q  What did you do?

"A  I started to walk in the door.

"Q  And what happened then?

"A  The door started sliding to.

"Q  Now, which way did that door slide?

"A  It slides from the highway.

"Q  So, saying it slides—

"A  It would be sliding west, wouldn't it?

"Q  It slides from the east to the west?

"A  That's right.

"Q  And it was standing open?

"A  It was standing open.

"Q  Now, how close were you to the door when it started to close?

"A  I was right close to the door, I'd say three foot of it when it started to. I made one more step and I was making a step when that door started to, and when that door came out, I threw my hands up like that to keep my body from going on against the door, because I had already made my motion to step.

"Q  Were you watching for that door to close?

"A  No, sir.

"Q  Why didn't you expect it to close?

"A  Because it was standing wide open.

"Q  Now, on your way—

"A  Nobody was near it.

"Q  On your way around to the restroom, did you have occasion to look at the other doors in Pinkey's Liquor Store that June evening?

"A  Yes, sir.

"Q  What were they—

"A  They were wide open.

"Q  They were wide open?

"A  Yes, sir.

"Q  You didn't see anybody walk in to open them?

"A  No, sir.

"Q  Why do you reckon those doors were open? What was your thoughts on it?

"A  Well, I don't know unless it was for the air. It was warm weather, and I don't know if it was just for the air or something.

"Q  But as you approached the door, you say you saw the glass slide to, is that correct?

"A  Start sliding to.

"Q  Sliding from the east to the west?

"A  Right.

"Q  It would be in that direction then?

"A  Yeah.

"Q  Did you see it directly? How did you notice it?

"A  Just when it started to, it made a Zzzzzing noise, and when it did, I threw my hand up.

"Q What do you mean by a Zzzzzing noise?

"A Something like that, sliding.

"Q Kinda like compressed air being released?

"A Kinda like compressed air being released or something, and it started to.

"Q And at this time you say you don't know whether there was a mat there or not?

"A No.

"Q You hadn't noticed it. Have you been back out there since?

"A No, sir.

"Q You don't know whether there is a mat there now or not?

"A Not on that side, I haven't been back. I have been in the front, but I haven't been in the side.

"Q When that door started sliding to, approximately how close were you when you threw up your hand?

"A I would say I was in three foot of it, because I was just starting to make a step, and I had to stop myself with my hands to keep my face from hitting that door.

"Q Assuming the front of that witness box is that door, Luid, would you stand up and show what happened? The front, right here, of the witness box where that microphone is?

"A Oh, right here?

"Q Yeah.

"A Well, as I stepped, I made a step to here, and when I started to step this step, the door just Sizzed out in front of me, and I did like that to keep from— my face from going on in it, because I was going to make a step like that and my face would have hit it, and I caught my weight and kept my face away from the door there.

"Q You didn't cut your left hand at all on that door, did you?

"A No.

"Q It was your right arm?

"A It was this hand right here.

"Q I see. And what happened when you struck your hand up there, Luid?

"A That glass flew all to pieces.

"Q The glass broke?

"A It broke all to pieces.

"Q Where did your right hand strike the glass?

"A Right close to the edge of the door.

"Q And it shattered. How badly did it shatter?

"A All the way up."

On cross-examination, appellee testified:

"Q And, of course, you had been out there to Pinkey's before, had you not, sir?

"A Yes, sir, I had been out there before.

"Q Sir?

"A Yes, sir, I had been out there before.

"Q Several times?

"A Well, two or three times.

"Q You were familiar with the store?

"A Yes, sir.

"Q And familiar with the doors and where they were?

"A Yeah.

"Q And, now, you have got that pointed, I believe, with the restroom and the drive-in shed and the door faces south toward Tahoka?

"A Yeah.

"Q And isn't there a sidewalk, elevated sidewalk a little above ground level

which is in the front of Pinkey's and all around the south side?

"A   Yeah.

"Q   Sir?

"A   There is one at that particular place where I stepped off to go under that shed."

Appellee offered no other witness except himself.

Appellant offered four witnesses, all of whom were employees of appellant. Appellant's witnesses testified that all the doors were closed on the occasion when the accident happened; that the doors were periodically inspected and serviced by Lubbock Glass and Mirror Company; and that they had never failed to function properly. They testified that in their opinion, the appellant had been drinking and was "tight." One eye witness to the accident gave this description as to what happened:

"Q   But were you on duty that night that a man did break or cause to break the south door, is that correct?

"A   Yes, sir.

"Q   Now, do you remember about what time of day or night it happened, Mr. Murphy?

"A   I don't know the exact hour, but it was dark. It was maybe about seven-thirty or eight o'clock.

"Q   How was the weather on that night?

"A   It was raining.

"Q   Was it raining hard or raining a lot?

"A   It was a blowing rain, yes, sir.

"Q   Immediately before the accident occurred, were you standing anywhere close to the south door?

"A   Yes, sir.

"Q   Where were you standing in reference to the south door, please?

"A   I was about a foot off of the mat of the south door.

"Q   Would that put you what, some four or five feet from the door?

"A   Anywhere from three and a half to five feet, yes, sir.

"Q   Okay. Now, do you know whether or not at that time that south door was closed?

"A   Yes, sir, it was closed.

"Q   I will ask you whether or not, Mr. Murphy, did you ever see the gentleman involved in the accident before the accident happened?

"A   Just like I can't recognize him now, but the same gentleman that got hurt was in earlier that evening.

"Q   But had you seen him immediately before the accident happened?

"A   I mean—what period of time, sir?

"Q   Just right before.

"A   I saw him just about the time he run into the door.

"Q   All right. Did you see the gentleman approaching the door?

"A   Yes, sir.

"Q   Was he approaching the door straight on, or was he approaching it at an angle?

"A   It was at an angle.

"Q   And as he approached the door, was he moving fast or slow? Just describe that, if you will, please, sir?

"A   He was going faster than a walk.

"Q   And did he ever strike the mat, put his foot on the mat before he got to the door?

"A   Yes, sir.

"Q And then did he ever slow down after he put his foot on the mat?

"A No, sir.

"Q Where did he put his foot on the mat?

"A Not directly in front of it. He came in from an angle, a side angle to where—

"Q All right. State whether or not it was about midway of the mat?

"A I couldn't say whether it was midway. It was close to midway.

"Q Did the man slow his speed at any time before he got to the door?

"A No, sir, not from the time I seen him.

"Q Did the door start to open before he hit it?

"A Before he hit it?

"Q Yes, sir.

"A No, sir, you have to touch the mat before the door will open.

"Q When he touched the mat did the door start to open?

"A It started to open.

"Q And then did he proceed almost instantly into the door?

"A Yes, sir, by the time he hit the mat the door didn't have time to get open. He hit the door.

"Q Did it open any?

"A Just a little."

Another witness for appellant testified as follows:

"Q Did you have that door fixed that night?

"A Yes, sir.

"Q Did you fix it?

"A No, sir.

"Q Who fixed it?

"A Lubbock Glass & Mirror.

"Q And you, of course, don't know what they did in fixing it, do you?

"A I know they took the door out and put a new glass in it.

"Q All right. Other than that, you don't know what else they did to it?

"A That's all."

In response to special issues submitted to them by the trial court, the jury found that the defendant had the exclusive control and direction of the door opening mechanism in question. The jury found that on the occasion in question, the defendant failed to warn plaintiff of the hazard involved in entering its premises through the door. The jury further found that at the time and on the occasion in question, the defendant failed to turn off the electric current to the glass door; that the defendant failed to adequately inspect the opening devices on the glass door; and that each of the above acts were negligence and the proximate cause of the injury. The jury further found that the appellee did not fail to keep a proper lookout; that the appellee did not approach the glass door at a fast rate of speed; and that appellee did not walk into the glass door. The issues submitted were found in favor of the appellee, and the court entered judgment on the verdict of the jury for appellee in the sum of $2,524.-00.

The appellant moved for judgment at the close of the plaintiff's testimony, which was overruled, and again at the close of the evidence, which motion was also overruled, and by appropriate assignments of error, appellant challenges the sufficiency of the evidence to support the jury's finding and the judgment of the trial court based upon such findings. We are of the opinion these assignments must be sustained.

In the case of A. C. Burton Co., Inc. v. Stasny et al., Tex.Civ.App., 223 S.W.2d 310, the court held:

"In the case of Marshall v. San Jacinto Bldg., Tex.Civ.App., 67 S.W.2d 372, 374, w/e ref., the court, under a similar state

of facts, announced the rule of law defining the duties of the owners and operators of premises with reference to alleged dangerous conditions thereof to invitees using the building for legitimate business purposes. The court, in its opinion, quoting with approval from 45 C.J. 837, said: ' "The duty to keep premises safe for invitees applies only to defects or conditions which are in the nature of hidden dangers, traps, snares, pitfalls, and the like, in that they are not known to the invitee, and would not be observed by him in the exercise of ordinary care. The invitee assumes all normal or ordinary risks attendant upon the use of the premises, and the owner or occupant is under no duty to reconstruct or alter the premises so as to obviate known and obvious dangers, nor is he liable for injury to an invitee resulting from a danger which was obvious or should have been observed in the exercise of reasonable care." Again, at page 868, same volume: "No precautions are necessary where the danger is obvious and unconcealed, or known to the person injured, or where it was the duty of the person injured to do the thing, failure to do which caused the injury." To the same effect is the rule announced by 20 R.C.L. pp. 56, 57: "The true ground of liability is the proprietor's superior knowledge of the perilous instrumentality and the danger therefrom to persons going upon the property. * * * And, hence, there is no liability for injuries from dangers that are obvious, or as well known to the person injured as to the owner or occupant." Our Supreme Court announced the same general rule in Stimpson v. Bartex Pipe Line Co., 120 Tex. 232, 36 S.W. 2d 473, 476: "If it appear that the injury complained of was produced by a peril of an obvious or patent character a recovery should be denied." '

\*   \*   \*   \*   \*   \*

"In the instant case appellee testified that when he went into appellant's place of business he went in through the ornamental iron doors; that at that time he walked up to the window he later walked through and saw that it was a window and that he walked around it and went through the grill-work doors. He testified that, upon leaving the parts department, he first looked up and saw the same ornamental grill-work doors through which he had entered appellant's place of business, and that he dropped his head when some thirty feet from the doors and the plate glass window in question, and continued to walk with his head down, never looking up until he had crashed through the window. He testified that he 'never really looked straight ahead.'

"For the reasons stated we think that appellant was not liable for the injuries suffered by appellee.

"The cited authorities by the Supreme Court of this State are, we think, controlling in this appeal. It is apparent from the evidence adduced that the danger of injuring himself by walking into said window was obvious to appellee or that it should have been observed by him in the exercise of reasonable care."

This case and the authorities therein cited makes clear to this court that appellant is not guilty of negligence in this case which would sustain the judgment. The evidence shows without dispute that appellee was familiar with the premises and the doors, having been in the store several times.

If we assume that the door was closing rather than opening, as appellee testified, we doubt that it would have prevented the accident as appellee was caught off guard when he saw the door, and the physical facts show that he hit the door with such force that he shattered the glass completely.

The record shows that this door had been in operation for six months or better and no other accident had ever happened. It is further shown that the only repair to the door after the accident was to replace the glass and the door functioned perfectly.

About the only difference in the facts of this case and the case above cited is that the boy in that case walked through a glass window thinking it was a door, and this case where the appellee walked into a glass door thinking it was open.

We are of the opinion the evidence wholly fails to show any negligence on the part of the appellant which could be the proximate cause of appellee's injury.

Judgment of the trial court is reversed and judgment here rendered that appellee take nothing.